## JOHN CRAWFORD v. BENJAMIN LOGAN.

### In Chancery.

The complainant, John Crawford, having made an improvement in what is now Kentucky, in the year 1774, on the 25th day of April, in the year 1780, applied to the court of commissioners for a certificate for a pre-emption of 1,000 acres of land, who directed the following entry to be made in their books, to-wit:

"John Crawford this day claimed a pre-emption of 1,000 acres of land, at the state price, in the district of Kentucky, on account of marking and improving the same in the year 1774. The witnesses being sworn and examined, in consideration of which, the court are of opinion that the said Crawford has a right to a pre-emption of 1,000 acres, offers to locate the same on the Hanging fork of Dick's river, which lands Samuel Craig has obtained a certificate for 1,000 acres pre-emption; therefore the court are of opinion that they can not grant a certificate to the said Crawford, and that he must proceed for redress by way of caveat."

In consequence of which, and in pursuance of the directions therein contained, the complainant entered a caveat in the general court of Virginia, against the emanation of a grant to the said Samuel Craig. The said caveat was determined before the opera-

tion of the law establishing a district court on the western waters. In consequence of which it was removed to this court for trial, and on the 11th day of June, in the year 1785, the following judgment was given, to-wit:

"By consent of the parties now present in court, it is ordered and adjudged, that the plaintiff recover against the defendant, 150 acres of land, to be laid off as follows, to-wit: Beginning on the lower line of the said Craig's pre-emption, on the west side of the Hanging fork, thence running up the creek at right angles, to the said Craig's line, so far that a line drawn parallel to the said Craig's line will include the said Crawford's old improvement, and no farther; and that each party pay their own costs."

But the court having omitted to direct the issuing of a pre-emption warrant to the complainant, and the register having refused to issue it without, at the September term, in the year 1786, they granted him the following certificate, to-wit:

"On the motion of John Crawford, and it appearing to the court from a certificate from the register, that the said register did not conceive himself authorized to issue the said Crawford a warrant for the pre-emption of 1,000 acres of land, on the Hanging fork of Dick's river, to include his improvement, agreeable to the certificate of the court of commissioners, bearing date the 25th day of April, 1780, and to the judgment of this court of 11th June, 1785, without the further order of this court. Ordered, that it be certified to the said register, that the said Crawford is entitled to the pre-emption of 1,000 acres of land, as certified by the said court of commissioners, and agreeable to the said judgment of this court, he having marked and improved the same in the year 1774, which he locates as follows, to-wit:

"To be bounded by the lands now remaining to Samuel Craig, by the said judgment, southwardly, and by the lands of James Logan, and of William Craig, extending eastwardly for quantity, including the said Crawford's cabins, built thereon in 1774. On the motion of Benjamin Logan, to be admitted as a party to contest the right of John Crawford, the court are of opinion that the said Logan could not be admitted as a party, as his claim originated on an entry made upon a treasury warrant, which was subsequent to the said Crawford's claim, and unknown to the court of commissioners; whereupon the said motion was rejected."

And the said complainant, on the 24th of October, in the year 1786, having obtained his pre-emption warrant, made the following entry thereon, to-wit:

Crawford *v.* Logan.

"John Crawford enters 1,000 acres of land, by virtue of a pre-emption warrant, No. 2690, lying on both sides of the Hanging fork of Dick's river, adjoining Samuel Craig's land, on the north-wardly side of the same, and James Logan's pre-emption of 400 acres, on his eastwardly side, and William Craig's, deceased, pre-emption of 1,000 acres, on the south-westwardly side; to begin at the said James Logan's south-east corner on his 400 acre pre-emption, at a white oak and two hickory saplings; thence with said Logan's line, north 25 east, crossing the Hanging fork, to his north-east corner, in the line of William Craig's pre-emption; thence with the line or lines of the said Craig's pre-emption, the several courses and distances thereof, up the Hanging fork to a sugar tree, a corner of said Craig's pre-emption, standing on the bank of the Hanging fork, and on the east side of the same; thence with the said Craig's line, south 58 east, so far that by running south 32 west, then north 70 west, and at the end of this course, running north 25 east, shall strike the beginning, and include the quantity of 1,000 acres, and the said Crawford's improvements."

And having surveyed his claim in the manner described on the plat, obtained a grant.

The defendant having, on the 26th day of May, in the year 1780, made the following entry with the county surveyor, to-wit:

"Benjamin Logan, assignee of Michael Goodnight, enters 600 acres upon a treasury warrant, lying on the Hanging fork of Dick's river, on the west side of, and adjoining to William Craig's settlement and pre-emption, to extend toward James Logan, Samuel Craig and George Clark's old place, for quantity."

And having surveyed the same in the manner described in the plat, obtained a grant older than that of the complainant.

The annexed connected plat, No. 18, was returned in this cause, of which the following is an explanation : •

Crawford *v.* Logan.

A B C D E F, the complainant's survey of 1,000 acres, run according to entry. G H I B C D, defendant's survey of 600 acres, the land now in dispute. B C D E K L M N O P Q, William Craig's pre-emption of 1,000 acres. M N O R S T U V, William Craig's settlement of 400 acres. *a b c d e f g,* Samuel Craig's pre-emption of 1,000' acres. E G H W, lines of Charles Cameron's pre-emption. X Y Z, the interference of Thomas Black's survey, with Samuel Craig's. *a h i* I, part of Owen Dever's settlement survey of 400 acres. *k h l,* lines of Owen Dever's pre-emption survey of 1,000 acres. *k i* B Q *m n,* James Logan, Jr.'s, pre-emption of 400 acres. O P & R, a piece of vacant land, left between William Craig's settlement and John Patterson's pre-emption. The land lying in the bend of the creek, and north-west of the lines T S R & *m,* is John Patterson's survey of 1,000 acres, made upon an entry on a treasury warrant, laid on his pre-emption claim. O 1, complainant's lower improvement. O 2, shown by John Crawford as his upper improvement. O 3, the spring shown by William Crow as complainant's upper improvement. O 4, is Samuel Craig's mark and improvement, as shown by him and complainant. O 5, is the spring and place shown by the defendant, for Samuel Craig's cabin, and is the place where the said Craig now lives. O 6, John Craig's improvement. O 7, Thomas Black's spring and improvement. O 8, Owen Dever's improvement. O 9, is the place where the complainant and defend-

ant say James Logan's improvement was, which was William Fields' improvement, that was nighest the complainant's lowest improvement, and is where James Logan, Jr., now lives. O 10, is the place shown by defendant for James Logan's improvement, and is the place where James Logan, deceased, first settled. O 11, George Clark's old improvement. O 12, William Craig's improvement. O 13, Warner's cabin. O 14, Samuel Craig's rail pen improvement. O 15, Abraham Miller's improvement. O 16, is a spring that Thomas Black says the complainant told him he had marked or improved. O 17, an improvement James Rennix says he saw marked I C. O 18, an improvement that Samuel Craig claimed near George Givens'. O 19, is where complainant lives. 20 to 21, and dotted line, represent a dividing line agreed upon between Samuel Craig and the complainant. *A* to *B*, the Hanging fork of Dick's river. *C* to *D*, the Knob lick fork. *E*, the branch that runs by Thomas Black's improvement. *F*, the creek that runs by James Logan, Jr.'s, plantation, called the Big creek. *G H*, and dotted line, the old trace from Benjamin Logan's to Harrodsburg. Distances: From 5 to 1, 425 poles; from 5 to 2, 223 poles; from 5 to 3, 218 poles; from 5 to 4, 114 poles; from 1 to 3, 232 poles; from 3 to 2, 108 poles; from 5 to 7, 426 poles; from 5 to 6; 298 poles; from 5 to 8, 575 poles; from 5 to 10, 605 poles; from 5 to 14, 212 poles; from 14 to 15, 210 poles; from 15 to 16, 86 poles; from 1 to 11, 712 poles; from 1 to 12, 394 poles; from 1 to 13, 124 poles; from 1 to 9, 155 poles; from 7 to 17, 160 poles; from 7 to 18, 400 poles.

The certificates and entries which were read at the trial of the cause, are as follow to-wit:

*February* 2, 1780.

"William Craig this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, on account of raising a crop of corn in the country, in the year 1776, lying on the Hanging fork of Dick's river, on the east side of the said branch, three miles from Col. Logan's station, to include his improvement. Satisfactory proof being made to the court, they are of opinion that the said Craig has a right to a settlement of 400 acres of land, to include the said improvement, and the pre-emption of 1,000 acres adjoining, and that a certificate issue accordingly."

*February* 9, 1780.

"William Craig enters 400 acres, by virtue of a certificate, etc.,

lying on the Hanging fork of Dick's river, on the east side of the said branch, three miles from Logan's, to include his improvement."

*January* 1, 1780.

"William Craig enters a pre-emption warrant of 1,000 acres adjoining his settlement on the Hanging fork of Dick's river, to include the said fork, running south-east for quantity."

"I do certify that William Craig's settlement of 400 acres, and pre-emption of 1,000 acres, lying on the Hanging fork of Dick's river, were surveyed the 19th day of July, 1781.

"JAMES THOMPSON, S. L. C."

*January* 2, 1780.

"John Craig, by William Craig, this day claimed a settlement and pre-emption to a tract of land in the district of Kentucky, on account of raising a crop of corn in the country, in the year 1776, lying on a small branch of the Hanging fork of Dick's river, about three-quarters of a mile from the said fork, on the east side, two miles from Col. Logan's station. Satisfactory proof being made to the court, they are of opinion that the said Craig has a right to a settlement of 400 acres of land, to include the said improvement, and the pre-emption of 1,000 acres adjoining, and that a certificate issue accordingly."

*January* 2, 1780.

"Samuel Craig this day claimed a pre-emption of 1,000 acres of land, at the state price, in the district of Kentucky, on account of marking and improving the same, in the year 1776, lying on the Hanging fork of Dick's river, on the west side thereof, adjoining the lands of John Craig, to include his improvement. Satisfactory proof being made to the court, they are of opinion that the said Craig has a right to a pre-emption of 1,000 acres of land, to include the said improvement, and that a certificate issue accordingly."

*January* 2, 1780.

"Samuel Craig enters a pre-emption warrant of 1,000 acres, on the north-west side of the Hanging fork, including his improvement at the mouth of the Knob lick fork, and joining the south-east side of John Craig, running up and down the Hanging fork for quantity."

"I do certify that Samuel Craig's pre-emption of 1,000 acres, lying on the Hanging fork of Dick's river, was surveyed the 17th day of August, 1781."

*July* 30, 1781.

"Benjamin Logan enters 400 acres of land upon a treasury warrant, No. 6,313, lying on the waters of the Hanging fork of Dick's river, adjoining the lands claimed by Owen Dever and Samuel Craig's pre-emption, and James Logan's pre-emption of 400 acres."

*July* 30, 1781.

"Also, 200 acres upon part of a treasury warrant, No. 6,311, adjoining the south-west side of William Craig's pre-emption, and the north-west of Charles Cameron's pre-emption, and the north side of the entry of 1,000 acres of John Craig's."

"I do certify that Benjamin Logan withdrew the above entry of 400 acres, and the 200 acres, the 2d day of April, 1784, and that the said Logan's survey of 600 acres was made the 7th day of August, 1781, by virtue of an entry on a treasury warrant for that quantity, dated May 26, 1780."

JAMES THOMPSON, S. L. C.

The following facts were admitted by the parties, to-wit:

That the springs which Samuel Davis run a line from, to a walnut tree in Samuel Craig's corn field, and divided half way between, when he surveyed the complainant's pre-emption entry, are the springs laid down on the plat at O 3.

That the walnut tree is designated on the plat, O 4.

That Martha Logan heard the complainant tell her husband, James Logan, that he could not get a treasury warrant to lay on the land where he now lives, and that he had been to see William Stewart for that purpose, and that this conversation passed in March, 1781.

That the conversation which Matthew Logan heard between his father, James Logan, and the complainant, relative to the purchase of an entry made by John Logan, in the name of William Wyatt, of 500 acres, was some time in August, 1781.

That Benjamin Logan's patent for the land in dispute, as assignee of Michael Goodnight, is dated December 20, 1782.

That the conversation which James Feeland heard pass between Samuel Craig and John Crawford, when they attempted to adjust

the dispute about the interference of their claims, and Craig offered to establish a dividing line on the top of the ridge, and Crawford insisted to go into the valley over the ridge, to include an improvement, which Crawford said he had there, passed in February, 1781.

Also, that the conversation with Samuel Craig and David Logan, which David Logan speaks of, passed about the same time.

That Crawford cleared land, and made corn where he now lives, at O 19, in 1781.

That the line which James Feeland speaks of, was run by William Montgomery on the 7th of August, 1781, being the day when he surveyed Logan's 600 acres, and Samuel Craig's pre-emption.

That William Montgomery heard the conversation pass between John Crawford and Benjamin Logan, as it is stated by the said James Feeland, in his deposition.

That some time about the year 1786 or '7, the defendant purchased Thomas Black's settlement and pre-emption, which is represented in the plat as interfering with Samuel Craig's pre-emption; that since he has purchased the same, he and Samuel Craig have established a line between the two claims, by consent, by which line part of the interference laid down in the said plat is given up by the said Craig to the said Logan, as assignee of the said Black.

Defendant admits that Henry Graham, from whom the said Crawford, the complainant, sets forth in his bill that he purchased the rights or claims of the land now in dispute, is, and was on the first day of March, in the year 1780, heir-at-law to Archibald Graham, deceased, to whom the said Crawford had sold the said claims, and that he will not require further proof thereof, as demanded in his answer; and the said defendant doth admit the said repurchase to have been made, as set forth in said bill.

The complainant admits that Samuel Craig, on the 30th day of March, 1776, made an entry of 640 acres, on Henderson's books, lying on the main Hanging fork, on the north side, at the forks of the creek, running up the north branch for quantity.

The complainant in his bill alleged, that in the year 1774 he built cabins at two springs on the west side of the Hanging fork, below the mouth of the Knob lick fork, and declared them to be his choice of the country. That he laid in his claim before the court of commissioners, who admitted and certified his right to, but, on the opposition of Samuel Craig, refused to enter the loca-

Crawford *v.* Logan.

tion of his pre-emption; that in the year 1777 he sold his claim, by virtue of the said improvements, to Archibald Graham.

That the said Archibald departed this life in 1779, and that he repurchased the said claim from Henry Graham, his heir-at-law; that the defendant entered, etc., and prayed that the defendant, who had obtained the eldest grant, might be compelled to convey to him, etc.

The defendant, by his answer, admitted that the complainant laid in his claim before the commissioners, but denied that it was for the land now claimed. He said he understood, and he thought the commissioners did also, that it was for the land Samuel Craig holds. And from this suspicion, founded in part on the entry made in the commissioners' books, on the application of the said Crawford, he made his entry.

He also stated that the legality of the complainant's claim is doubtful upon principles of law, the certificate being granted for marking and improving, and he now claims on account of building two cabins, at two springs, which induced him to suppose that the marking and improving was on some other tract than that where the cabins were built. He also stated that he has been shown a spring by William Crow, who assisted the complainant to build his cabins, and which is claimed as one of the springs marked in the plat O 3, at which, and for many yards round it, there is no remains of a cabin, a tree belted, or any name cut on a tree. He stated also that the entry of the pre-emption is made neither agreeably to law or equity. Because, if the complainant had a right to the land at all, his claim was elder than that of the adjoining claimants; therefore he ought not to have given way to them. That he would have contested the manner of locating in court at the time the certificate was granted, in September, 1786, but that the court refused to admit him to do so. He stated, also, that the complainant endeavored to obtain a treasury warrant to lay on said land.

The following is a summary of the testimony:

William Crow, it appeared, was the witness called upon to prove the complainant's improvement, both before the commissioners and the court.

He swore positively to the lower improvement and to the spring designated in the plat O 3, which he at first thought was the place where the upper cabin was built. But in another deposition he said he was inclined to believe O 2 was the place, but he said he

found the cabin there further from the spring at O 3 than he had expected. William Crow said he was at the building of both cabins in 1774, and in 1776 himself and some others built Warner's cabin designated in the plat thus O 13, and that he did not lay in a claim for Warner before the commissioners, because he found the cabin was too near the complainant's upper improvement.

He said the company, among whom was William Steele, went from thence to the said improvement, which he then showed to Steele. He heard the complainant declare the said two improvements to be his choice of the country.

William Steele swore that he assisted William Crow and others to build Warner's cabin in 1776, at O 13.

From whence he set out in company with him to go to Abraham Miller's cabin, O 15. When they had proceeded about a quarter of a mile, Crow asked how far they were from Warner's cabin, and when he answered not far; the said Crow showed him a cabin, and told him whose it was, but the name he does not recollect.

That, before they came to the cabin, they crossed a small branch, which he believes to be the one to be laid down as running between Warner's cabin and O 2, which is the place Crow then showed him.

He said he afterward told Warner, on the Monongahela where he lived, of this circumstance, and that it was probable it would prevent him from getting the land.

He said he had seen a buckeye at the place marked O 2 on the plat, and a walnut at the place marked O 1 on the plat, and that the figures cut on the said walnut and buckeye are so much alike as to induce him to think they were marked by the same hand, and that the said figures are cut in the wood.

James Brown swore he assisted the complainant, in 1774, to build two cabins on the waters of the Hanging fork.

He said that having been called upon as a witness between the complainant and Samuel Craig, in 1784 or 5, and hearing the upper cabin was missing, it put him to recollect their situation; and from his best recollection, he thought they were about three-quarters of a mile apart. The upper cabin farthest from the Hanging fork, on the north side of a ridge, the branch running middling square off from the fork, somewhere between north and west; he did not remember water courses between said cabins.

He said about the 17th of September, 1787, he was with the

complainant at the place shown by William Crow. The complainant said Crow was right as to the spring, but not as to the cabin, and took him down the branch about a quarter of a mile, and showed him the appearance of an old cabin and tree marked 1774.

He said when they were on their way, in 1774, to build the cabins, and while at work, the complainant said they were his choice places.

He said he remembered the ground about the lower cabin, and thinks he saw the complainant mark a walnut, which he has found standing at or near the head of the spring marked I C 1774.

William Fields swore that in 1776, he and others built a cabin for Jesse Warner, on the Hanging fork, and, after leaving the cabin some distance, they came to a cabin, which William Crow, one of the company, said belonged to John Crawford, the complainant.

That Crow, although requested by Warner so to do, did not lay in his claim before the commissioners, on account of the nearness of Crawford's cabin to Warner's. At the time they built Warner's cabin, they came from Abraham Miller's.

He said, also, that in the year 1774, he built two cabins on the land whereon James Logan, Jr., now lives, and on which James Logan, Sr., did live, and that it was then agreed upon between the complainant and himself, that the claims of each should extend half way between their nearest cabins, to be laid off with a square line.

He said, also, that the complainant ratified the said agreement with James Logan, when the said Logan had obtained a certificate for the land, including the said two cabins.

He also said, that when he made this agreement with the complainant, the complainant told him he meant to lay his claim on the two improvements which are designated on the plat O 1 and O 2.

He said, that in April, 1780, he went in company with John Crow, William Crow, William Agan, and the complainant, from Clark's station to the defendant's station, where the commissioners were sitting. That William Crow and the complainant set out to look for the complainant's cabin, and that he saw a cabin on the left hand, before they came to the Hanging fork.

John Crow swore that he heard the complainant say, in the year 1780, that the two improvements, which are designated on the plat O 1 and O 2, were his choice of the country.

He said he was with the complainant when the complainant blazed a tree at the lower improvement in ·1774, and then he saw the letters and figures on the blaze I C, 1774. He said he came to the company there, where they had built part of a cabin, and understood from them they had built a cabin that day higher up the fork.

He said he did not know that the complainant had built any cabin in the country after the one at the lower improvement.

He said he went with the complainant to the said lower cabin, as they were going to attend the commissioners; he was not certain whether he saw the cabin from the road or not, but was certain he saw it as they went.

He said he heard William Crow say, he believed the place shown by the complainant for the upper improvement was the place where it was made, but that he found the cabin further from the springs than he had expected.

Samuel Gilmore swore that, in the year 1780, he frequently traveled from James Logan's to the defendant Logan's station.

That the complainant's lower improvement stood in full view of the road. He said he saw a walnut tree in the year 1780, at the lower improvement, on which was a blaze, in which was cut in the wood the letters I C, and the figures 1774, very plain, except the I, over part of which the wood was grown.

He said that when he first saw a buckeye at the upper improvement, there was the following figures on the said tree 177, and part of another figure which he took to be a 4.

He said he had heard the complainant say, some time before the tree was found, he had marked a tree at the upper improvement with the figures 1774, but that he did not recollect he had put any letters on it.

He said the letters and figures did not appear to have been blackened, but to be rather the color of the wood blackened with the weather.

He said he afterward saw the complainant go out with an axe, and when he returned, he said he had found the tree at the upper improvement; that the wood was grown over the date, but that he had taken it off.

James Gilmore swore that when he was first at the upper improvement, he saw no marks of an improvement except the foundation of an old cabin, and a buckeye tree on which was the appearance of an old blaze. He said that some short time after-

Crawford *v.* Logan.

ward he again saw the said buckeye tree, and then the bark was cut off the blaze, and he then discovered on it the figures 177 and another figure which he took to be a 4. He said the complainant told him he had cut the bark off the blaze.

He said, that in the year 1780, he saw a walnut tree at the lower improvement on which was C 1774, plainly cut in the wood, and when the wood, which was grown over the blaze, was taken off, he discovered the letter I before the C, but does not remember whether the letters and figures were blackened or not.

He said, in April, 1780, he went from Logan's station to James Logan's, and that the road was very plain and marked with a tomahawk, and went near the complainant's lower improvement, and that in 1780 there was no other road from Logan's station to James Logan's.

John Brown swore that, as counsel for the complainant, he made application to the court at the September term, 1786, for a certificate of his right of pre-emption. He said William Crow was introduced as a witness, to establish and identify the improvements on which the claim was founded. He said the said Crow deposed that in the year 1774, he assisted the said complainant to build two cabins, near to two springs running into the Hanging fork, on the west side.

That he swore positively to the situation of the lower spring and cabin; and also to the upper spring, but that he spoke doubtfully as to the situation and distance of the upper cabin from the upper spring; and he further said, that he has heard him express the same doubt in conversation, but whether before or after the examination he is not certain.

Stephen Huston swore that in the year 1779, or early in the year 1780, he was passing by a walnut tree, which tree he was at this day, to-wit: September 20, 1791, with James Gilmore, and was informed by him it stood at the complainant's lower improvement, and it was then marked I C on a blaze, and the letters appeared black, as if they had been put on with powder.

He said he went with the defendant to Wilson's station, when he entered the land in dispute between the complainant and himself, that he passed through the land and saw no improvement, as he recollects.

When he saw the tree he was in a small path, and saw it off to his left hand. The defendant and himself kept a road to the left of the path, about fifteen poles, which was much plainer than the path.

William Montgomery swore that he showed the two improvements to Benjamin Pettit and others; but whether they are marked on the plat O 1 and O 2, he can not tell, but they are the same improvements shown to him by the complainant when he surveyed the land by order of court. He said the walnut at the lower improvement had been blazed some years ago, and is marked on the blazed part, I C, 1774, but rather thinks the letters and figures were made some time after the tree was blazed, but does not know when that was done. At the buckeye at the upper improvement there are some marks, not legible; they appeared as if they might have been intended for figures, but there was no appearance of letters.

Samuel Davis, in a deposition taken the 23d of February, 1791, swore that about three years before that time he surveyed for the complainant 1,000 acres of land. That the complainant directed him to begin in the following manner, to-wit: Between the two springs shown by William Crow, and designated on the plat O 3, and to ascertain the distance between these springs and the marked walnut in Samuel Craig's field (which is O 4), and to run the line as exactly as he could half way between them.

He said the complainant then showed him where an old cabin had rotted down, about 40 poles down the branch, on the south side.

Stephen Fisher swore that he was present in April, 1780, when the complainant laid in his claim before the commissioners, at the defendant's station.

That he said he claimed the same land Samuel Craig claimed, and when the commissioners told him they could not grant him a certificate for that land, as they had already granted one to Samuel Craig, he said he would go to Williamsburg for redress.

Jacob Myers swore he was present when the complainant applied to the commissioners; that they asked him if he had no other improvement on which he could lay his claim; that he said he had, but that he would not lay it on any other land but that which had been granted to Samuel Craig.

John Martin swore that the place claimed by the complainant was not the place he claimed before the commissioners, but that before them he claimed Samuel Craig's place.

Matthew Logan swore that the most public road from Clark's station to Logan's station went by James Logan's, and within a few poles of an improvement claimed by the complainant, which improvement was on the left hand going from Clark's to Logan's,

Crawford *v.* Logan.

and was in full view of the road. He said there was no other road in 1780, from James Logan's to the defendant's station.

James Logan swore that before Christmas he and his father's family stayed about two weeks at John Craig's cabin, and near to it, on the Hanging fork, and made a trace from thence to where James Logan, Sr., did live, by where the complainant now lives, and near to his lower improvement, and also by the place where he now lives.

He said the said path was frequently traveled, and when he left Kentucky, about the 8th of April, 1780, there was a plain path from Clark's station, by John Dougherty's, where John Logan, Sr., did live, where he, the deponent, lives, by the complainant's lower cabin into Clark's old trace, or Harrod's trace, nearly opposite to a small distance beyond John Craig's cabin.

Edward Worthington swore that in 1779 and 1780 he was well acquainted with the country between Clark's old station and the defendant's station.

That he never knew any road to be traveled but one, which crossed above where William Fields did live, and passed by a plantation claimed by Azariah Davis, and near that fell into the trace which leads from Harrodsburg, by Samuel Craig's, to Logan's station.

That in the spring of the year 1780, returning from the defendant's station to Harrodsburg, he rode in company with a certain John Dougherty, who traveled with him nearly as far as where John Reed lives, and then parted from him to go home.

James Neville swore that he was well acquainted with that part of the country that lies between Clark's old station and the defendant's station, and that he knew of but one road which was used by people, which went by Samuel Craig's, until June or July, 1780, when he saw a road which led from James Logan's, which he thinks must have been made about that time, as it was fresh beaten and not long used.

John Martin's deposition as to the road was the same as Neville's except that he said he discovered the road from James Logan's in the fall of 1780, and that it was then fresh, and had the appearance of being newly made.

Jonas Black and Rebecca Black both swore that in 1783 the complainant advised Thomas Black, in surveying, to run down on Samuel Craig, and force him lower down the Hanging fork, which would give the complainant land he wanted to get. That the

complainant said he had marked I C on a tree at O 16, and not William Crow, and that he claimed it until he went farther down the creek and found land he liked better, and Thomas Black himself confirmed what they had deposed.

James Craig swore that in 1776 Samuel Craig made an improvement on the west side of the Knob lick fork, below where Thomas Black since lived, called the Rail camp (marked on the plat O 14), that he sowed apple seeds there, which he did not hear of his doing at any other of his improvements.

That the said Samuel Craig afterward, to-wit, in 1776, made another improvement higher up, where Thomas Black has since lived (marked on the plat O 7); but that he always understood Samuel Craig's first improvement was made where he has since lived (marked on the plat O 5), and he knew it was the improvement for which the pre-emption was granted, because he said he was the witness who proved the claim before the commissioners. He said, the said Samuel Craig also made some improvement, and marked a walnut tree at the place (marked in the plat O 4), which is about the middle of his corn field. He said he always expected Samuel Craig would settle where he has since lived, and clear around the walnut tree.

Benjamin Pettit swore that in the year 1776 he was in the woods about where Samuel Craig has since lived. That he saw an improvement and pen made of some rails, above said Craig's, and further up the waters he saw also a cabin at a big spring.

That James Craig told him, in 1778, those improvements were Samuel Craig's. He said in answer to this question: Was it likely that a person claiming the land where Samuel Craig lived would run down and take the land where the complainant lived in preference to the land above?

That he thought he would not, as the land between Samuel Craig's and the complainant's is a good deal broken with ridges, and the land above Craig's is very good.

Stephen Huston swore that Samuel Craig told him that an improvement on the west side of the Knob lick fork, below where Thomas Black lived was his improvement, and that he claimed the land where the road crossed the Hanging fork, leading from Logan's station to Harrodsburg.

George Clark swore that the cabin Samuel Craig claimed from 1776 to 1780 stood near the Hanging fork, on the north-west side, about 20 poles from the path which leads from the defendant's sta-

Crawford v. Logan.

tion to Harrodsburg, and about 200 yards from the forks, where the Knob lick fork emptied into the Main fork, and Samuel Craig's improvement was a noted one.

George White swore that in 1779 he saw the cabins or improvements claimed by Samuel Craig; one was a cabin at a big spring, where Thomas Black lives; another on the waters of said branch above said Black's, as he then supposed about two miles, and he thought was near where George Givens lives; the other was about a mile below the cabin where Black lives, to the left of the branch, and above the place where Samuel Craig lives.

Evan Kelbreath swore that Samuel Craig claimed a cabin, in the year 1780, that stood on the tract of land where he now lives, and was on the waters of the branch that runs by Thomas Black's, which cabin appeared to be old in the fall of the year 1779. Said Craig now claims the same land by a military warrant.

James Davis swore that when he first came to the country, in conversation with the complainant, the complainant told him that he first improved the place where Abraham Miller formerly lived, and that he had given it up to William Crow, in 1774. Also, that he marked another spring which run into Black's run, and where Black lives he had marked a tree, all which he intended to be in the same survey, and he had given up to Crow.

James Logan swore that in the year 1780 Samuel Craig and himself met as he was going to the defendant's station, where the commissioners were then sitting. Craig told him the complainant was about to claim both their lands, and advised him to stop the complainant from getting a certificate. He said when they got to the station he saw Fields, who had sold him the improvement, who told him the complainant should not go farther than half way, for that was their agreement, and the complainant being spoken to, agreed to it.

James Logan also spoke of running the dividing line with the complainant, and that the complainant, in 1781, endeavored to get a treasury warrant to lay on the land he claimed.

Thomas Smith swore the complainant was made a prisoner by the Indians in September, 1781, and did not return until September, 1783.

James Feeland swore that he was present in the year 1781, when the complainant and Samuel Craig were endeavoring to adjust the dispute between them concerning the interference of their lands, and that the said Craig informed him that the com-

plainant wished to run to include an improvement he claimed, which was within the lines of his pre-emption. He said he was present when William Montgomery, in company with the defendant and Samuel Craig, were making a survey, about three or four hundred yards from where the complainant lives, and that the complainant informed the defendant that he was surveying his pre-emption.

That the defendant answered, he verily believed that the complainant had once a right to a pre-emption of land there, but by his neglect had lost it, and believed he never would recover it.

By THE COURT.—The complainant must recover of the defendant six hundred acres of land, as described on the connected plat by the letters G H I B C D, being the whole of the land in controversy, with costs, etc.

Defendant agreed to convey with a special warranty, etc.